IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

RICARDO RODRIGUEZ-TREVINO

CRIMINAL CASE NO.
3:11-cr-00004-TCB-RGV

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S**
**REPORT, RECOMMENDATION, AND ORDER**

Attached is the Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 21st day of February, 2012.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

3:11-cr-00004-TCB-RGV

RICARDO RODRIGUEZ-TREVINO

**MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER**

Defendant Ricardo Rodriguez-Trevino ("defendant") is charged in a two-count indictment with conspiring to possess with the intent to distribute at least five hundred (500) grams of methamphetamine in violation of 21 U.S.C. §§ 841(b)(1)(A)(viii) and 846, and possessing with the intent to distribute at least five hundred (500) grams of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii). [Doc. 1].[1] Defendant has moved to suppress evidence and statements obtained as a result of a traffic stop that occurred on January 27, 2011. [Doc. 23]. Following an evidentiary hearing held on November

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

3, 2011,[2] the parties filed post-hearing briefs on the motions. [Docs. 38, 39 & 41]. For the following reasons, it is **RECOMMENDED** that defendant's motion to suppress evidence and statements, [Doc. 23], be **DENIED**.[3]

## I. STATEMENT OF FACTS

On January 27, 2011, at approximately 9:00 a.m., uniformed Georgia State Patrol Trooper Chris Matthews ("Trooper Matthews")[4] was monitoring traffic from the center median along Interstate 85 in Troup County, and he observed a blue Chevrolet vehicle (the "vehicle") with a Texas license plate traveling in his direction, immediately slow down below the speed limit as it approached him, catching his attention. (Tr. at 4-5, 9, 25-26, 31-32, 41). As the vehicle passed Trooper Matthews, he observed the vehicle "fail to maintain its lane and cross the white fog line" in

---

[2] See [Doc. 31] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. __)."

[3] The government has agreed not to use any of defendant's post-arrest statements in its case-in-chief, see [Doc. 38 at 2-3; Doc. 41 at 1 n.1]; see also (Tr. at 67). Accordingly, it is **RECOMMENDED** that defendant's motion to suppress with regard to his statements be **DENIED** as moot.

[4] At the time of the evidentiary hearing, Trooper Matthews had been employed as a trooper with the State of Georgia for six and a half years and had been assigned to the Criminal Interdiction Unit for the past two years as a K-9 trooper. (Tr. at 4). Although Trooper Matthews had his K-9 with him in his patrol vehicle during the traffic stop at issue, he did not deploy the K-9 at any time while at the scene of the stop. (Tr. at 24-25, 51).

violation of O.C.G.A. § 40-6-48.[5]  (Tr. at 5, 9, 22-23, 32-34, 52).  Upon observing the vehicle cross the white fog line, Trooper Matthews decided to pull onto the interstate and follow the vehicle, at which time he observed someone seated in the right front passenger seat pop up as if she had been "reclined back in the seat either sleeping or laying down."  (Tr. at 9, 12, 46).  While Trooper Matthews followed the vehicle, he ran the license plate through his computer system and learned that the vehicle had crossed the border from Mexico just a few days earlier.  (Tr. at 23, 30, 44).  After following the vehicle for about eight to nine miles, Trooper Matthews then observed it fail to maintain its lane for a second time by crossing the white fog line.  (Tr. at 5, 32-34, 42).  At this time, Trooper Matthews activated his blue lights and conducted a traffic stop of the vehicle for failure to maintain its lane.[6]  (Tr. at 5, 12, 41, 48, 53).

Trooper Matthews exited his patrol car, approached the passenger's side of the vehicle, and asked the driver, later identified as defendant, for his driver's license and insurance.  (Tr. at 10, 12; Gov. Ex. 1).  The passenger, later identified as Norma Hernandez ("Hernandez"), explained that the defendant did not speak

---

[5] O.C.G.A. § 40-6-48 provides in relevant part that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  O.C.G.A. § 40-6-48(1).

[6] The evidence at the hearing included a video recording depicting the traffic stop in question.  <u>See</u> (Tr. at 5-8; Gov. Ex. 1).

English and she therefore acted as a translator between Trooper Matthews and defendant.[7] (Tr. at 12; Gov. Ex. 1).  Hernandez further explained that defendant had left his driver's license at home and that it was expired, and she then provided Trooper Matthews with both of their identification cards issued by the state of Texas as well as a copy of the insurance information, which showed that the vehicle was registered to a third-party but that Hernandez, who claimed ownership of the vehicle and presented a bill of sale purportedly showing she was the owner of the vehicle, was maintaining the insurance on the vehicle.  (Tr. at 10-11, 13-14, 17, 40-41, 49; Gov. Exs. 1, 2 & 9).  While standing at the passenger's side window, Trooper Matthews asked Hernandez where they were traveling to and Hernandez replied that they were traveling from Texas to Atlanta in search of work because one of defendant's friends had lined up work for them, but Hernandez was unable to provide any details about the type of work, where it was, or who defendant's friend was, and simply explained that they were to call defendant's friend once they reached Atlanta.  (Tr. at 14, 28-29; Gov. Ex. 1).  Hernandez then stated, "'But I'm going back home because I miss my children.'"  (Tr. at 28-29; Gov. Ex. 1).[8]  Trooper

_____

[7] Hernandez has also been indicted based on this same incident, but she was charged separately in Criminal Case No. 3:11-cr-00005-TCB-RGV.

[8] Trooper Matthews testified that he thought Hernandez's explanation of their traveling plans "was sketchy" because "it's not something the normal motoring public does."  (Tr. at 14, 28-29).

Matthews then advised defendant and Hernandez that he had stopped their vehicle because it had failed to maintain its lane at which time defendant "motioned to [Trooper Matthews] that he was messing with the radio," implying that was the reason he had failed to maintain his lane. (Tr. at 14, 35-36; Gov. Ex. 1).

While he was speaking with defendant and Hernandez, Trooper Matthews observed in plain view in the front center console of the vehicle a large candle depicting the image of Santa Muerte.[9] (Tr. at 12-13, 27; Gov. Ex. 3). In addition, Trooper Matthews observed that there was only a single key in the ignition of the vehicle, which he believed was an indicator of an attempt to mask ownership of the vehicle.[10] (Tr. at 13, 23, 26). Trooper Matthews testified that his knowledge that the vehicle had just recently crossed the border from Mexico, that neither the driver nor the passenger possessed a valid driver's license, and his observations of the candle in the console and the single key in the ignition of the vehicle coupled with Hernandez's "sketchy" explanation of why she and defendant had traveled to Atlanta from Texas, which Trooper Matthews described as a known drug trafficking

---

[9] Trooper Matthews testified that Santa Muerte, translated as "Saint Death," was known as the patron saint of drug traffickers. (Tr. at 12-13, 27).

[10] In particular, Trooper Matthews explained that drug traffickers often provide their couriers with a single key to the car and take their house keys or any other personal effects that could be used to link the car back to the trafficker off of the key ring in the event of the courier's arrest. (Tr. at 13, 26-27).

state, were "signs of criminal activity that [he] want[ed] to look further into." (Tr. at 15-17, 26-29, 48).

Subsequently, Trooper Matthews returned to his patrol vehicle and contacted the High Intensity Drug Trafficking Area/Blue Lightening Operations Center ("HIDTA/BLOC") to conduct a background check on defendant and Hernandez and obtain their criminal histories as well as to confirm that the vehicle had in fact recently crossed the border from Mexico. (Tr. at 15).[11] After Trooper Matthews received information from HIDTA/BLOC, which confirmed that Hernandez had crossed the border from Mexico in the vehicle on January 24, 2011, and that both Hernandez and defendant had criminal histories, he prepared a consent to search form on the computer in his patrol car and printed the form in Spanish for both Hernandez and defendant to sign as the owner and operator, respectively, of the vehicle. (Tr. at 16-18, 35, 37-38, 64-66; Gov. Exs. 8 & 9).[12]

---

[11] At this time, Trooper Matthews testified that based on what had transpired thus far, he "was going to see if [he] could get consent to search because [he] believed there was some type of criminal activity going on, and go from there." (Tr. at 17, 35).

[12] Trooper Matthews testified that since Hernandez claimed ownership of the vehicle, he wanted to obtain her consent but that he also wanted defendant's consent since he was operating the vehicle and therefore in control of it and the vehicle was actually registered to a third-party although Hernandez maintained insurance and had a bill of sale that bore her name. (Tr. at 17-18; Gov. Ex. 9).

Approximately twenty-eight minutes after he had initiated the traffic stop,[13] Trooper Matthews exited his patrol car and walked back to the vehicle and asked Hernandez to read the Spanish consent to search form, at which time Hernandez, after appearing to read the form, agreed to consent and then placed her signature at the bottom of the form.  (Tr. at 17-18; Gov. Exs. 1 & 4).  Thereafter, Trooper Matthews asked the defendant to step out of the vehicle and he provided defendant with the Spanish consent to search form and asked Hernandez to explain to him in Spanish that since he was in control of the vehicle, Trooper Matthews wanted his consent to search the vehicle.  (Tr. at 18, 36; Gov. Ex. 1).  Specifically, Trooper Matthews asked Hernandez "not to read the form to him, but to explain to him to read the form and if he agreed to sign it."  (Tr. at 36; Gov. Ex. 1).  Based on Trooper Matthews' request, Hernandez explained to defendant in Spanish that Trooper Matthews had said "if you sign that paper, since the car is mine but you were driving.  I have to sign it giving him the rights to check . . . He said that you were driving.  You have to sign it too to give him permission," to which defendant

---

[13] Trooper Matthews testified that the traffic stop had lasted approximately twenty minutes prior to his request for consent to search, (Tr. at 48), and the video recording shows that the traffic stop had lasted twenty-eight minutes prior to his request for consent to search, see (Gov. Ex. 1).

replied, "Oh, ok," then appeared to read the form,[14] and then motioned to Trooper

Matthews to show him where to sign the form. (Tr. at 18, 24; Gov. Ex. 7).[15] After

Trooper Matthews pointed to where he needed him to sign, defendant signed the

consent to search form. (Tr. at 18; Gov. Exs. 1 & 4).[16]

---

[14] Hernandez testified under oath before a Grand Jury that defendant was able to read Spanish. (Tr. at 64).

[15] The government retained Isabel Martinez ("Martinez"), a freelance Spanish interpreter to translate the Spanish consent to search form as well as portions of the video recording of the traffic stop at issue. (Tr. at 55-62; Gov. Exs. 4, 6 & 7). In particular, the Spanish consent to search form signed by both Hernandez and defendant, as translated by Martinez, provides in relevant part as follows:

> I, Ricardo R. Trevino, hereby give permission to MATTHEWS . . . officers of the highway state patrol to search the following described vehicle, including luggage and bottles and all types of contents. This includes the removal of any panel or components of the vehicle with the most minimum access, intruder to any compartment used for the purpose of concealing contraband.
>                                     . . .
> I do understand that I have the right to deny give permission to the above described search and deny signing this form. Additionally, I state that no promises, threats, force, coercion, of any kind has been used against me to make me give permission to the above described search or the signing of this form.
>
> My permission is being given freely and voluntarily.

(Gov. Exs. 4, 6).

[16] At the time Trooper Matthews requested consent from the occupants of the vehicle, there was only one other officer present at the scene. (Tr. at 49). At some point after Trooper Matthews began searching the vehicle, two additional officers arrived on the scene. (Id.).

After both occupants of the vehicle had signed the consent to search form, Trooper Matthews, along with other officers who had arrived on the scene for backup, proceeded to search the vehicle and they recovered additional Santa Muerte items as well as 23 bundles of narcotics, later determined to be methamphetamine, concealed behind the vehicle's firewall under the hood.  (Tr. at 19-22; Gov. Ex. 5). Trooper Matthews testified that at no time during this incident did any officer draw their weapon, make any threats, or use any force against defendant or Hernandez. (Tr. at 50; Gov. Ex. 1).

## II.  DISCUSSION

Defendant challenges the initial traffic stop on January 27, 2011, as not supported by reasonable suspicion or probable cause, and therefore, contends that all evidence and statements arising therefrom are due to be suppressed.  [Doc. 39 at 6-10].  Defendant also asserts that even if the traffic stop was lawful, that it was unnecessarily prolonged.  [Id. at 10-11].  Finally, defendant argues that his consent to search the vehicle was not valid because it was the product of an illegal stop and not voluntary.  [Id. at 11-14].  The Court will address each of these arguments.

## A.    Validity of Initial Traffic Stop

"The Fourth Amendment protects individuals from unreasonable search and seizure."  United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam)

(unpublished) (citation and internal marks omitted). The "[t]emporary detention of individuals during the stop of an automobile by the police, even if for only a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996) (citations omitted); <u>see also</u> <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001); <u>United States v. Edenilson-Reyes</u>, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (<u>citing</u> <u>United States v. Spoerke</u>, 568 F.3d 1236, 1248 (11th Cir. 2009); <u>Purcell</u>, 236 F.3d at 1277); <u>see also</u> <u>United States v. Monzon-Gomez</u>, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); <u>United States v. Simmons</u>, 172 F.3d 775, 778 (11th Cir. 1999); <u>United States v. Sierra</u>, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ." <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (alterations in

original) (citations and internal marks omitted); <u>see also</u> <u>United States v. Boyd</u>, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); <u>United States v. Woods</u>, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).

An officer's subjective intentions and opinions are irrelevant where the officer has probable cause for the stop. <u>See</u> <u>United States v. Mwangi</u>, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); <u>see also</u> <u>United States v. Arango</u>, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); <u>Miller v. Harget</u>, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); <u>United States v. Jimenez</u>, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." <u>United States v. Wright</u>, No. CR210-022, 2010 WL 4967468, at *1 (S.D.

Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

In addition, "[t]he propriety of the traffic stop . . . does not depend on whether the defendant is actually guilty of committing a traffic offense." United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed." Id. (citation omitted).

Defendant argues that Trooper Matthews stopped him, not because he observed him cross the fog line, but because he wanted to "pursue his hunch that a crime was underway." [Doc. 39 at 7]. In this regard, defendant argues that Trooper Matthews simply "manufacture[d] a reason to stop and search [his] vehicle" because a failure to maintain lane "only becomes a traffic violation when one drives outside their lane thereby creating an unsafe situation," and in this case, there was no such unsafe situation "since there were no other vehicles in his vicinity." [Id. at 10].

The evidence presented at the hearing demonstrates that Trooper Matthews initiated a traffic stop of the vehicle after he twice observed it fail to maintain its lane in violation of O.C.G.A. § 40-6-48. (Tr. at 5, 9, 12, 22-23, 32-34, 41, 48, 52-53). While

Trooper Matthews testified that there was no traffic in the vicinity of the vehicle the first time he saw it fail to maintain its lane, see (Tr. at 32, 40), he also testified that there were other vehicles, including a tractor-trailer, near defendant's vehicle when it failed to maintain its lane the second time, see (Tr. at 40). However, even if there was no traffic in the vicinity of defendant's vehicle, as defendant argues, defendant's vehicle "was stopped because it failed to maintain its lane, which is a traffic violation under O.C.G.A. § 40-6-48." United States v. Hodges, Criminal Action No. 5:07-CR-55(WDO/HL), 2007 WL 3027360, at *1 (M.D. Ga. Oct. 15, 2007); see also United States v. Richardson, No. CR 108-151, 2009 WL 668706, at *2 (S.D. Ga. Mar. 12, 2009), adopted at *1 (finding probable cause to believe that defendant had failed to maintain his lane in violation of O.C.G.A. § 40-6-48 even where no other cars were near the vehicle at that time); United States v. Salley, No. CR406-313, 2007 WL 1035133, at *2 (S.D. Ga. Mar. 30, 2007), adopted at *1 (citation and internal marks omitted) ("Weaving without reason into nearby lanes violates O.C.G.A. § 40-6-48(1)."). Indeed, "the propriety of the traffic stop does not depend on whether the defendant is actually guilty of committing a traffic offense," but instead, "the pertinent question is whether it was reasonable for the officer to believe that a traffic offense had been committed." United States v. Crump, Criminal Action File No.

4:10–CR–032–HLM–WEJ, 2011 WL 6153106, at *5 (N.D. Ga. Nov. 21, 2011) (citation omitted), adopted by 2011 WL 6179211, at *8 (N.D. Ga. Dec. 12, 2011).

It was reasonable for Trooper Matthews to believe that a traffic offense had been committed since he had actually observed defendant's vehicle twice fail to maintain its lane, a fact defendant has not disputed. See Richardson, 2009 WL 668706, at *2 (citing Rayo-Leon v. State, 635 S.E.2d 368, 370 (Ga. Ct. App. 2006) ("finding that police officer was justified in effecting a traffic stop where he had observed the defendant fail to maintain his lane by twice crossing traffic lines, in violation of O.C.G.A. § 40-6-48")); see also United States v. Robinson, 272 F. App'x 774, 778 (11th Cir. 2008) (per curiam) (unpublished) ("[Defendant's] weaving between lanes gave [law enforcement] probable cause to believe that [O.C.G.A. § 40-6-48(1)] was being violated, and therefore the traffic stop was not unreasonable."). "Moreover, under Whren, once [Trooper Matthews] witnessed a violation of the state's traffic laws, [his] stop of [defendant's] vehicle was appropriate regardless of any 'pretextual' motivations." Crump, 2011 WL 6153106, at *5 (citation omitted); see also United States v. Johnson, No. CR407-164, 2007 WL 2874303, at *3 (S.D. Ga. Sept. 26, 2007), adopted at *1 (citation omitted) ("The stop of defendant's vehicle to enforce the Georgia traffic laws was entirely proper, and the fact that the officer had another reason for the stop . . . is simply irrelevant to the Fourth Amendment

inquiry."). In short, Trooper Matthews' testimony established that he had probable cause to believe that defendant had violated Georgia law, which is "all that is necessary to conduct a traffic stop." United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citation omitted).

Defendant also contends that Trooper Matthews unreasonably extended the traffic stop. [Doc. 39 at 10-11]. Specifically, defendant asserts that "[c]onsidering the traffic stop was pretextual to begin with . . . twenty minutes was excessive and therefore constitutionally infirm." [Id. at 11]. "[A]n officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place, and the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted). "[A]n officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check." Edenilson-Reyes, 2010 WL 5620439, at *10 (citation omitted). "The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time

reasonably required to complete that mission." <u>United States v. Cantu</u>, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished) (citation and internal marks omitted). "When examining the reasonableness of a traffic stop, the length of time before consent is given to search is also relevant." <u>Garcia</u>, 284 F. App'x at 794 (citation omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *10 (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." <u>United States v. DeJesus</u>, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted). That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted). Furthermore, where an officer initiates a legal stop, he has "the duty to investigate suspicious circumstances that then [come] to his

attention." <u>Cantu</u>, 227 F. App'x at 785 (alteration in original) (citation and internal marks omitted).

Trooper Matthews testified that after he approached defendant and Hernandez, explained to them the reason for the stop, obtained their identification cards, and inquired as to their travel plans,[17] <u>see</u> <u>United States v. Ellis</u>, 497 F.3d 606, 614 n.1 (6th Cir. 2007) (citation and internal marks omitted) ("It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop."), he returned to his patrol car and ran the information through his computer system and HIDTA/BLOC and learned that neither defendant nor Hernandez had a valid driver's license, that both had prior criminal histories, and that Hernandez had just crossed the border from Mexico in the vehicle, (Tr. at 35, 38, 49). Therefore, Trooper Matthews has pointed "to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] the investigatory detention," and he was thus justified in prolonging the stop. <u>Richardson</u>, 2009 WL 668706, at *3 (citations omitted); <u>see also</u> <u>United States v. Garcia-Aleman</u>, No.

---

[17] During this initial encounter, Trooper Matthews also observed a large candle depicting the image of Santa Muerte in the front center console of the vehicle and noticed only a single key in the ignition of the vehicle, which further raised his suspicion that defendant and Hernandez may be involved in drug trafficking. (Tr. at 12-13, 23, 26-27).

1:10-CR-29, 2010 WL 2635071, at *1 (E.D. Tex. June 9, 2010), adopted by 2010 WL 2635073, at *1 (E.D. Tex. June 30, 2010) (citations omitted) ("[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.").  In fact, "the brief detention was a reasonable response to the totality of the circumstances," Ellis, 497 F.3d at 614, and Trooper Matthews "diligently pursued a means of investigation that was likely to confirm or dispel his suspicions as quickly as possible," United States v. Johnson, No. CR05-4063-MWB, 2005 WL 2704892, at *6 (N.D. Iowa Oct. 20, 2005).  In short, the twenty-eight minute traffic stop was not unreasonable under these circumstances. See United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (per curiam) (finding seventy-five minute Terry stop reasonable); United States v. Cooper, 873 F.2d 269, 275 (11th Cir. 1989) (per curiam) (finding thirty-five minute reasonable suspicion detention reasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (finding Terry stop lasting almost fifty minutes reasonable).

**B.    Consent to Search**

The subsequent search of the vehicle was lawful pursuant to both Hernandez and defendant's voluntary consent.  "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant

18

to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Emanuel, 440 F. App'x 881, 883-84 (11th Cir. 2011) (per curiam) (unpublished); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007). "An officer conducting a routine traffic stop may request consent to search the vehicle." United States v. Lamela-Cardenas, Criminal Action No. 1:11–00122–KD–C, 2011 WL 3494562, at *5 (S.D. Ala. Aug. 10, 2011) (citations omitted). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360; see also Crump, 2011 WL 6153106, at *6; United States v. Teague. No. 2:10–CR–006–RWS–SSC, 2010 WL 6529640, at *19 (N.D. Ga. Nov. 12, 2010), adopted by 2011 WL 1497876, at *1 (N.D. Ga. Apr. 19, 2011).

The government bears the burden of proving that consent was voluntary, United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances, see Schneckloth, 421 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337. Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Purcell, 236 F.3d at 1281.

Defendant, as the driver of the vehicle, and Hernandez, who claimed to own the vehicle and who was maintaining insurance coverage on the vehicle, both had authority to consent to a search of the vehicle. See United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999). Therefore, defendant's "argument on this point must be rejected if either [he] or [Hernandez] voluntarily consented to the search of the [vehicle]." Id. (citation omitted). The evidence presented at the hearing shows that Trooper Matthews first obtained the consent of Hernandez, whose consent was unequivocal as evidenced by the video recording which shows her cooperating and speaking with Trooper Matthews in a conversational tone in English, appearing to read the consent to search form, and placing her signature on the form. (Tr. at 11, 17-18; Gov. Exs. 1 & 4). Thus, Trooper Matthews did not need defendant's consent prior to searching the vehicle. Nevertheless, to the extent there is a question regarding the true ownership or possessory rights of the vehicle, the Court will address defendant's arguments regarding the voluntariness of his consent as the driver of the vehicle.

Defendant argues that his consent to search the vehicle was not voluntary because he "had been detained approximately twenty minutes and was being investigated by multiple armed and uniformed State Troopers including a K9 unit, with their patrol cars lined up and blue lights activated." [Doc. 39 at 13]. Defendant

further asserts that he "had been removed from his vehicle [and] he'd been made to successfully produce his I.D. and other documentation." [Id.]. The evidence in this case, however, completely refutes defendant's arguments. In particular, only Trooper Matthews and one other officer were present at the scene when Trooper Matthews requested consent, and neither officer drew their weapon, made any threats or displayed or used any force, and in fact, they had no physical contact with defendant at all. (Tr. at 50; Gov. Ex. 1); see also Edenilson-Reyes, 2010 WL 5620439, at *14 (finding presence of three officers did not render consent involuntary). In addition, the length of detention prior to the consent "was not extraordinary" and "did not effect the voluntariness of the consent." Edenilson-Reyes, 2010 WL 5620439, at *13 (citing United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) ("finding that 20 to 25 minute period between stop and consent was 'not the kind of prolonged detention that might contribute to a coercive environment'")). Moreover, an officer may as a matter of course order the driver of a lawfully stopped vehicle to exit his vehicle. See Pennsylvania v. Mimms, 434 U.S. 106 (1977); United States v. Rodriguez, Criminal Case No. 1:10–CR–0407–TWT–JFK–3, 2011 WL 5191805, at *10 (N.D. Ga. Sept. 23, 2011), adopted by 2011 WL 5191798, at *1 (N.D. Ga. Oct. 31, 2011) (citations omitted); United States v. Espinal, Criminal Case No. 1:11–cr–00060–ODE–RGV, 2011 WL

7004195, at *9 n.12 (N.D. Ga. Aug. 29, 2011), adopted by 2012 WL 92451, at *3 (N.D.

Ga. Jan. 10, 2012) (citation omitted).  From the moment Trooper Matthews began

interacting with both Hernandez and defendant, they cooperated with Trooper

Matthews, and during the search neither defendant nor Hernandez voiced any

objections, nor did they rescind their consent in any way.  (Gov. Ex. 1).

Defendant also argues that he "did not understand Trooper Matthews'

questions and instructions."  [Doc. 39 at 14].  Defendant asserts that Trooper

Matthews' utilization of Hernandez as a translator was improper because she "had

a clear conflict of interest[] to act as his agent to procure [defendant's] consent."

[Id.].[18]  However, the evidence shows that defendant understood and consented to

Trooper Matthews request as translated by Hernandez, and that the transcript, as

interpreted by Martinez, shows that Hernandez specifically relayed Trooper

Matthews' request to defendant and that defendant replied, "Oh, ok," read the

consent to search form printed in the Spanish language, and then signed the form.

(Tr. at 18, 24; Gov. Exs. 1, 4 & 7).  Thus, "[t]he Court easily concludes that

[defendant's] consent was voluntarily given and was not the result of coercion,

---

[18] Defendant further argues that the government "failed to provide information on [his] education or his competence at reading."  [Doc. 39 at 14]. However, defendant's argument in this regard is without merit as the evidence shows that defendant was able to read Spanish and that he had prior experience with law enforcement.  (Tr. at 64; Gov. Exs. 8 & 9).

either expressed or implied." <u>United States v. Suarez</u>, 694 F. Supp. 926, 939-40 (S.D. Ga. 1988) (finding consent to search voluntary where defendant consented to officer's request to search where request was actually translated by defendant's wife); <u>see also</u> <u>United States v. Jasso-Trevino</u>, 113 F.3d 1247, 1997 WL 226151, at *1, 4 (10th Cir. 1997) (unpublished) (finding consent voluntary where passenger who spoke English translated request for driver who only spoke Spanish); <u>United States v. Valenzuela-Beltran</u>, Criminal No. 09-00124-11, 2010 WL 1881088, at *2, 5 (W.D. La. Apr. 21, 2010), adopted by 2010 WL 1881871, at *1 (W.D. La. May 6, 2010) (finding consent valid where passenger of the vehicle understood and spoke English and served as an interpreter for the driver who only spoke Spanish during the traffic stop).

Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that defendant freely and voluntarily consented to a search of the vehicle. <u>See</u> <u>Brown</u>, 223 F. App'x at 880 (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); <u>United States v. Hidalgo</u>, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the

ground at gunpoint); <u>Garcia</u>, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers' refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search); <u>United States v. Espinosa-Orlando</u>, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint by four agents, forced to lie on the ground near the roadway, and provided consent while one officer had his weapon drawn). Additionally, "once [defendant] gave [Trooper Matthews] consent to search his vehicle, he also provided consent to prolong the traffic stop." <u>Lamela-Cardenas</u>, 2011 WL 3494562, at *7 (citation omitted). Moreover, because there is no evidence that defendant "limited his consent in any way, the permissible scope of the search was limited only by the bounds of reasonableness, and it was reasonable for Trooper [Matthews] to search any compartment within the vehicle where narcotics might be found." <u>DeJesus</u>, 435 F. App'x at 902 (internal citations and marks omitted). Finally, when Trooper Matthews discovered the 23 bundles behind the vehicle's firewall under the hood, "he had probable cause to seize, relocate, and conduct further searches of the vehicle[, if any]." <u>Id.</u> (citation omitted). Accordingly, defendant's motion to suppress, [Doc. 23], is due to be denied.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that defendant's motion to suppress evidence and statements, [Doc. 23], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 21st day of February, 2012.

_____
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE